IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 1:26-cv-00006 |
| | ) | |
| v. | ) | |
| | ) | |
| REAL PROPERTY LOCATED AT | ) | |
| 2096 DELOIT BLVD. IN DENISON, | ) | VERIFIED COMPLAINT |
| IOWA, APPROXIMATELY $27,320 IN | ) | FOR FORFEITURE IN REM |
| U.S. CURRENCY, AND | ) | |
| APPROXIMATELY 21 FIREARMS | ) | |
| AND AMMUNITION, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, the United States of America, hereby files and serves this VERIFIED COMPLAINT IN REM and alleges as follows:

## I.     NATURE OF THE ACTION

1.     This is an action to forfeit and condemn specific property to the use and benefit of the United States of America (hereinafter "Plaintiff") for its involvement, as set forth below, in one or more violations of 21 U.S.C. §§ 841 (illegal distribution), 846 (conspiracy), and 856 (maintaining a drug-involved premises).

2.     This civil forfeiture action involves property related to the *United States v. Bryce McMullen*, No. 1:24-cr-00071 (S.D. Iowa 2024), which charged Defendant McMullen (hereinafter "MCMULLEN") with conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine.

3.     MCMULLEN pled guilty to the conspiracy charge on February 14, 2025, and was sentenced on June 10, 2025, to 120 months in federal prison.

4.    As discussed more fully below, the drug conspiracy at issue involved other individuals and other federal criminal prosecutions, as well.

5.    The forfeitures arise from a conspiracy between and involving MCMULLEN, Brian Davis (hereinafter "DAVIS"), Lonnie Ray Arthaloney (hereinafter "ARTHALONEY"), Lawrence Allan Petersen II (hereinafter "PETERSEN"), Drug Source #1, and others, by at least 2023 and into 2024, to traffic methamphetamine in the Southern District of Iowa and elsewhere.

6.    Plaintiff alleges that the real property located at 2096 Deloit Boulevard, Denison, Iowa 51442 (hereinafter the "Defendant Real Property") was used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841 (illegal distribution), 846 (conspiracy), and 856 (maintaining a drug-involved premises) and is therefore forfeitable under 21 U.S.C. § 881(a)(7).

7.    Plaintiff alleges that the seized U.S. currency (hereinafter the "Defendant Currency") is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) as proceeds traceable to an exchange of moneys furnished or intended to be furnished in exchange for a controlled substance and/or as moneys used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841 (illegal distribution) and 846 (conspiracy).

8.    Plaintiff herein alleges that the seized firearms (hereinafter the "Defendant Firearms") are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(11) as firearms used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of controlled substances in one or more violations of 21

U.S.C. §§ 841 (illegal distribution), 846 (conspiracy), and 856 (maintaining a drug-involved premises).

## II.    THE DEFENDANT PROPERTIES

9.    The Defendant Property is comprised of real property, United States currency, and various firearms and ammunition, described more specifically as follows:

    a.    The Defendant Real Property is located at 2096 Deloit Boulevard, Denison, Iowa 51442, and consists of three contiguous parcels of land described as:

        i.    a parcel of land located in the SE1/4 of SE1/4, Section 26, Township 84 North, Range 39 West, in Crawford County, Iowa;

        ii.    a parcel of land lying immediately East of and adjacent to the above parcel of land, same lying in the SW1/4 SW1/4 of Section 25, Township 84 North, Range 39 West; and

        iii.    a parcel of land located in the SE1/4 SE1/4 of Section 26, Township 84 North, Range 39 West of the Fifth Principal Meridian, Crawford County, Iowa.

MCMULLEN has owned the Defendant Real Property since approximately 2007.

    b.    The Defendant Currency allegedly subject to forfeiture is described as approximately $27,320 in United States currency seized from Drug Source #1 on January 5, 2024.

    c.    The Defendant Firearms and Ammunition subject to forfeiture are described as:

        i.    a Riley Defense, Inc. RAK 47 7.62 semi-automatic rifle (SN: B37633);

        ii.    a SAKO RIKRAM Rifle Defense Inc. .22 bolt action rifle with a scope;

        iii.    a Ruger M77 Mark II .223 bolt action rifle (SN: 785-55796) with a scope;

iv.   a DC Industries Model NDS-1P semi-automatic rifle;

v.    a Browning .22 long rifle;

vi.   a stolen Savage 242 Series C .410 shotgun (SN: D060528);

vii.  a Black Aces Tactical FNR 12-gauge shotgun (SN: 21-BLP49660) with two magazines, a drum magazine, an extended magazine, a case, and a red dot sight;

viii. a Taurus Raging Hornet .22 revolver (SN: UE886563) with a scope;

ix.   a J.P. Sauer & Sohn Western Marshal .357 revolver (SN: 18206/3);

x.    a Smith & Wesson Model 57 .41 Magnum revolver (SN: N692368) with a sleeve holster;

xi.   a Remington Model 1100 12-gauge semi-automatic shotgun (SN: L241896M) with a scope;

xii.  a Mossberg 500A 12-gauge shotgun (SN: J423949);

xiii. a Ruger 10/22 .22 rifle (SN: 290-24491);

xiv.  a Ruger M77 Mark II 30-06 bolt action rifle (SN: 783-11633);

xv.   a Mossberg New Haven 283TB .410 bolt action shotgun (SN: 341472);

xvi.  a Taurus Model PT99AF 9mm pistol (SN: TLL90727D), partially disassembled;

xvii. a Taurus 971 Tracker .22 revolver (SN: UK919832) with a scope;

xviii. a Bushmaster .223 semi-automatic rifle (SN: CRB061721);

xix.  a Savage Model 10 .308 rifle (SN: G032153) with a scope;

xx.   a Romarm-Cugir Model WASR-10 7.62 semi-automatic rifle (SN: A1-79367-20) with a magazine;

xxi.  a 7.62 semi-automatic rifle (SN: 2A1RF1) with a magazine, two .308 rounds, and a case;

4

xxii.   223/5.56 ammunition loaded in three magazines;

xxiii.   .22 caliber ammunition in a blue plastic case and a partial box of .357 ammunition;

xxiv.   4 boxes of ammunition in a clementine box;

xxv.   miscellaneous ammunition in a grey box;

xxvi.   numerous rounds of miscellaneous ammunition in a green plastic case;

xxvii.   miscellaneous ammunition in a miliary footlocker; and

xxviii.   miscellaneous ammunition in a plastic bucket.

The firearms and ammunition were seized from the Defendant Real Property.

10.   The details of the seizures are discussed more fully below.

## III.   JURISDICTION AND VENUE

11.   The Court has jurisdiction over this civil action commenced by Plaintiff under 28 U.S.C. § 1345 and over this action for forfeiture under 28 U.S.C. § 1355(a).

12.   The Court has in rem jurisdiction and venue over the Defendant Real Property under 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## IV.   APPLICABLE STATUTES

13.   The Controlled Substances Act was enacted by Congress as Title II of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (1970) (codified at 21 U.S.C. §§ 801–904).

14.   The term "controlled substance" is defined in 21 U.S.C. § 802(6) to mean a drug or other substance, or immediate precursor, included in any of the five schedules of such substances set forth in subchapter I of Title 21.

15.     Schedule II substances have a high potential for abuse and have a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions, but use may lead to severe psychological or physical dependence. 21 U.S.C. § 812(b)(2)(A)–(C).

16.     Methamphetamine is a Schedule II controlled substance. 21 C.F.R. § 1308.12(d)(2) (2025).

17.     Under the Controlled Substances Act, it is unlawful to distribute, dispense, or possess with intent to distribute a controlled substance unless authorized by law to do so. 21 U.S.C. § 841(a)(1).

18.     Under the Controlled Substances Act, it is unlawful to use any communications facility, including the U.S. Mail, to distribute or facilitate the distribution of controlled substances. 21 U.S.C. § 843(b).

19.     Under the Controlled Substances Act, is unlawful to attempt or conspire to distribute, dispense, or possess with intent to distribute controlled substances. 21 U.S.C. § 846.

20.     Under the Controlled Substances Act, it is unlawful to manage or control any place, whether permanently or temporarily, either as an owner, lessee, agent, employee, occupant, or mortgagee, and knowingly and intentionally rent, lease, profit from, or make available for use, with or without compensation, the place for the purpose of unlawfully manufacturing, storing, distributing, or using a controlled substance. 21 U.S.C. § 856(a)(2).

21.     Under the Controlled Substances Act, all moneys or things of value furnished or intended to be furnished by any person in an illegal exchange for a controlled substance, all proceeds traceable to such an exchange, and all moneys used or intended to be used to facilitate a violation of Subchapter I of the Controlled Substances Act are subject to forfeiture. 21 U.S.C. § 881(a)(6).

22.     Under the Controlled Substances Act, all real property, including any right, title, and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a violation of the Controlled Substances Act punishable by more than one year's imprisonment is subject to forfeiture. 21 U.S.C. § 881(a)(7).

23.     Under the Controlled Substances Act, all firearms used or intended to be used to facilitate the transportation, sale, receipt, possession, or concealment of controlled substances are subject to forfeiture under 21 U.S.C. § 881(a)(11).

## V.     FACTS

### A.     Known Characteristics of Drug Traffickers

24.     Law enforcement officers know, based on their training, professional education, and experience, the following facts about drug traffickers and their methods of operation:

>       a.      Drug traffickers often keep the controlled substances they are illegally dealing in their physical possession or under their constructive control in strategic locations they deem safe from detection or theft, including, but not limited to, residences, vehicles, garages, storage units, outbuildings, and other structures.

7

b.    Drug-trafficking conspiracies often use separate residences, or "stash houses," to store, conceal, and protect their cash proceeds, drug supply, packaging materials, and other facilitating property.

c.    Drug traffickers often keep firearms and ammunition to protect themselves from harm and their drugs and drug money from robbery.

d.    Drug trafficking is predominately a cash business because those in the trade seek to prevent financial institutions and law enforcement from becoming suspicious of their activities if they would regularly deposit and/or withdraw large amounts of cash into legitimate banking accounts.

e.    Relatively large amounts of cash found with or near distribution quantities of controlled substances, or in or near locations involved in drug trafficking, such as stash houses or vehicles used in drug trafficking, usually constitute drug proceeds.

f.    It is common for drug traffickers to separate their proceeds by denomination and put the currency in rubber banded stacks in varying $1,000 increments to facilitate quick counting.

g.    Drug traffickers often transport the cash proceeds of their criminal activity through various means, including, automobiles, and hidden in seemingly innocuous containers or wrapped in packaging intended to keep the drug money from being detected by any law enforcement officers the money courier may encounter.

h.    A quantity of a controlled substance is indicative of intent to distribute when it is more than an average user would generally keep for personal use.

i.    Evidence tending to prove a person or persons were illegally distributing or intended to illegally distribute controlled substances includes, but is not limited to:

     i.    a connection of the person to the possession of illegal drugs, digital scales, drug paraphernalia, packaging materials and/or devices, cash in an amount not typical for a person with legitimate income to possess or packaged or bundled in a suspicious manner, and firearms and ammunition;

8

ii.    the use by such person of multiple cell phones, one they use to coordinate illegal drug activity and another for legal activities;

iii.   an alert by a properly trained drug detection dog to the scent of controlled substances on personal or real property associated with the person;

iv.    the use by the person of vehicles or addresses not registered, owned, rented, or leased in their own name, and other measures taken to obscure their identities; and

v.     a connection of the person to a drug source state, such as California, and a drug destination state, such as Iowa.

### B.    Overview of the Conspiracy

25.    On March 27, 2024, PETERSEN was charged in this district with, among other things, conspiracy to distribute fifty grams or more of actual methamphetamine and 500 grams or more of a mixture and substance containing methamphetamine, for his involvement in the conspiracy at issue in this case. *United States v. Lawrence Allen Petersen, II*, No. 1:24-cr-00021 (S.D. Iowa 2024).

26.    PETERSEN's actions discussed herein were part of the conspiracy giving rise to this forfeiture case.

27.    PETERSEN personally distributed methamphetamine to others in this district on or about October 3, 2023, and October 9, 2023.

28.    PETERSEN acquired the methamphetamine he distributed from both DAVIS and ARTHALONEY.

29.    PETERSEN pled guilty to the conspiracy charge on May 17, 2024, and was sentenced September 12, 2024, to 134 months in federal prison.

30.    On April 24, 2024, a grand jury in this District signed a Second Superseding Indictment charging DAVIS and ARTHOLONEY with conspiracy to distribute fifty grams or more of actual methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine. The Second Superseding Indictment also charged DAVIS with three counts of distributing methamphetamine and charged ARTHALONEY with two counts of distributing methamphetamine. *United States v. Brian Davis and Lonnie Ray Arthaloney*, No. 1:23-cr-00071 (S.D. Iowa 2024).

31.    The actions of DAVIS and ARTHALONEY discussed herein were part of the conspiracy giving rise to this forfeiture case.

32.    On September 13, 2023, DAVIS pled guilty to the conspiracy charge and agreed to forfeit $38,000 and $3,292 in seized drug proceeds. He was sentenced on May 13, 2025, to 240 months in federal prison.

33.    On September 24, 2024, ARTHALONEY pled guilty to the conspiracy charge and agreed to forfeit $10,580 in seized drug proceeds.

34.    ARTHALONEY was sentenced on January 14, 2026, to 204 months' imprisonment.

35.    ARTHALONEY supplied methamphetamine to DAVIS, which DAVIS then sold to others.

36.    During the October 19, 2023, search of DAVIS' residence in Council Bluffs, Iowa, law enforcement found approximately sixty-six grams of actual

methamphetamine, $38,000 in United States currency, thirteen grams of cocaine, scales, and drug ledgers. These items were evidence of drug trafficking.

37.    On November 7, 2023, law enforcement seized 544.98 grams of methamphetamine from DAVIS's vehicle, which was the remnants of two pounds of methamphetamine he had obtained the day before. DAVIS had already sold a portion of the two pounds.

38.    On December 19, 2023, law enforcement arrested DAVIS and ARTHALONEY and discovered ARTHALONEY possessed $10,580 in drug proceeds and DAVIS possessed $3,292 in drug money. Seventy-five pounds of methamphetamine was discovered in their vehicle, which they intended to distribute to other individuals in the Southern District of Iowa.

39.    Drug Source #1 was supplying DAVIS and ARTHALONEY with loads of as much as between fifty and sixty pounds of methamphetamine in 2023, approximately every two to three weeks.

40.    On October 23, 2024, Drug Source #1 was charged in the U.S. District Court for the Southern District of Iowa with conspiracy to distribute fifty grams or more of methamphetamine and 500 grams or more of a mixture and substance containing a detectible amount of methamphetamine.

41.    The conspiracy discussed herein that gives rise to this forfeiture case trafficked at least 104,843.30 grams of actual/ice methamphetamine.

42.    DAVIS, ARTHALONEY, and others used MCMULLEN's residence, the Defendant Real Property, to store methamphetamine.

## C.    <u>The Defendant Currency</u>

43.    In approximately January 2024, Drug Source #1 was under surveillance by Iowa law enforcement for being a source of methamphetamine for the conspiracy. On or about January 3, 2024, Drug Source #1 travelled to a location near Denison, Iowa.

44.    Drug Source #1 was supplying ARTHALONEY with methamphetamine.

45.    The location to which Drug Source #1 travelled on or about January 3, 2024, was the Defendant Real Property, owned by MCMULLEN.

46.    The Defendant Currency was seized from Drug Source #1 on Friday, January 5, 2024.

47.    Just after midnight on Friday, January 5, 2024, an Iowa State Patrol (ISP) Trooper made a probable cause traffic stop of a gray Nissan Rogue with Florida license plates driven by Drug Source #1 on Interstate 80 near the east bound forty-two-mile marker because the vehicle was speeding above the posted seventy miles-per-hour limit.

48.    The driver provided his license and was identified as Drug Source #1.

49.    Another ISP Trooper (hereinafter the "dog handler") arrived on the scene and obtained permission from Drug Source #1 to use his properly trained drug detection dog to search the vehicle.

50.    The properly trained drug-detection dog was certified to identify the scents of marijuana, methamphetamine, cocaine, and heroin.

51.    Drug Source #1 stayed in the patrol vehicle of the trooper who stopped him, and was observed sending a text message that said, "they're searching the car." He then deleted the message, and several others.

52.    The drug detection dog alerted to the scent of one or more controlled substances.

53.    The dog handler asked Drug Source #1 if there was marijuana, methamphetamine, cocaine, or heroin in the vehicle, and Drug Source #1 answered "no."

54.    The dog handler asked Drug Source #1 if there was over $10,000 in cash in the vehicles, and Drug Source #1 answered "no."

55.    Drug Source #1 then said he had THC wax in his vehicle.

56.    After the positive alert from the properly trained drug detection dog, law enforcement conducted a probable cause search of the Nissan Rogue.

57.    During the search, law enforcement found a bag on the passenger floorboard that, among other things, contained a large amount of cash wrapped with rubber bands. Also in the bag was a small speaker box with more cash. Finally, there was a charging box in the plastic bag that contained even more cash.

58.    Located and seized during the probable cause search was approximately $27,320.00 in United State currency, a THC vape pen, and a receipt.

59.    Drug Source #1 was read his *Miranda* rights and said he understood them. Thereafter, he said he did not want to say the wrong thing about the money, which he said was in his bag.

60.    Photographs of the seized money are reproduced below.









61.    The driver and lone occupant of the Nissan Rogue, Drug Source #1, was identified as a resident of California, a drug source state.

62.    The Defendant Currency had indica of being, and is believed to be, proceeds of drug trafficking.

63.    Drug Source #1 was given a receipt for the property that was seized, as well as a warning ticket, and was released from the traffic stop.

### D.    The Defendant Real Property and the Defendant Firearms and Ammunition

64.    In October 2023, law enforcement learned the Defendant Real Property was being used as a stash house for the conspiracy to store pound quantities of methamphetamine at times.

65.    On Wednesday, January 10, 2024, a state of Iowa search warrant was executed at MCMULLEN's residence, the Defendant Real Property.

66.    While law enforcement officers were conducting surveillance of the Defendant Property before the search, they saw MCMULLEN leaving in a white Chevrolet Silverado.

67.    An ISP Trooper stopped MCMULLEN and a Department of Narcotics Enforcement (DNE) Special Agent, who was riding with the ISP Trooper, advised MCMULLEN that law enforcement had a warrant to search his residence, the Defendant Property.

68.    Law enforcement transported MCMULLEN back to the Defendant Property where he was advised of his *Miranda* rights, signed an acknowledgement form, and was interviewed.

69.    MCMULLEN advised that he had known ARTHALONEY for approximately ten years.

16

70.   MCMULLEN stated that they became friends after ARTHALONEY found out that he worked on older square-body Chevy pickups.

71.   MCMULLEN advised that in the last eight months, ARTHALONEY started meeting someone that MCMULLEN did not know at MCMULLEN's residence north of Denison.

72.   MCMULLEN advised that he knew of ARTHALONEY meeting someone at his residence approximately three separate times.

73.   MCMULLEN advised that he did not meet the male subject that ARTHALONEY was meeting at his residence, but he appeared to be a white male with a mustache.

74.   MCMULLEN advised that approximately two and a half months ago, he realized that ARTHALONEY was using MCMULLEN's residence to store methamphetamine.

75.   MCMULLEN advised that ARTHALONEY would give him approximately one or two ounces of methamphetamine when MCMULLEN needed it.

76.   MCMULLEN advised that on one occasion ARTHALONEY advised MCMULLEN that he stored forty pounds of methamphetamine at MCMULLEN's residence.

77.   MCMULLEN stated that ARTHALONEY advised him that he had traveled to California with MCMULLEN's trailer in the past.

78.    MCMULLEN advised that on one occasion, ARTHALONEY instructed him to put approximately ten pounds of methamphetamine into a truck that was parked on MCMULLEN's property for someone to pick up, and he did so.

79.    MCMULLEN described the methamphetamine he stored for ARTHALONEY as approximately ten pink/red saranwrap packages and approximately two tin foil wrapped packages.

80.    MCMULLEN stated that on another occasion, DAVIS and an unknown female came to MCMULLEN's residence at the direction of ARTHALONEY to get methamphetamine.

81.    MCMULLEN said that once DAVIS arrived, DAVIS grabbed the methamphetamine that he had come there to get out of ARTHALONEY's old Chevy pickup that was parked on MCMULLEN's property.

82.    MCMULLEN estimated that this took place at approximately 10:30 pm, five months beforehand.

83.    MCMULLEN said that just a week before, Drug Source #1 was parked at his residence when he got home after work.

84.    Drug Source #1 told MCMULLEN that MCMULLEN owed him approximately $100,000 from ARTHALONEY's drug debt.

85.    MCMULLEN said he invited Drug Source #1 inside of his house to further the conversation.

86.    MCMULLEN stated Drug Source #1 said two separate times that if the debt wasn't paid, MCMULLEN would be found dead in a ditch.

18

87.    MCMULLEN advised that Drug Source #1 told him that someone would call him on Monday (January 8, 2024) and drop off approximately ten pounds of methamphetamine so that MCMULLEN could start paying off his debt.

88.    MCMULLEN advised that Drug Source #1 wanted MCMULLEN to receive fifty pounds of methamphetamine, but MCMULLEN talked it down to ten pounds.

89.    MCMULLEN advised that he paid Drug Source #1 approximately $3,000 so that Drug Source #1 would leave his house.

90.    MCMULLEN advised that Drug Source #1 had not contacted him since he was at his house the week before.

91.    At the Defendant Real Property, law enforcement located and seized the Defendant Firearms and Ammunition, discussed above, approximately eighteen grams of methamphetamine, drug paraphernalia, a digital scale with residue on it, a stolen Harley Davidson motorcycle, marijuana, and a money counter.

92.    The methamphetamine, digital scale, and money counter, as well as the firearms and ammunition, are all indicia of drug trafficking.

93.    ARTHALONEY estimated that during the conspiracy he provided MCMULLEN with approximately 200 pounds of methamphetamine, and he said that loads of methamphetamine totaling between fifty and 100 pounds were delivered to MCMULLEN's residence, the Defendant Real Property.

## VI.    COUNT ONE
## FORFEITURE UNDER 21 U.S.C. § 881(a)(6)

94.    Plaintiff repeats and realleges each and every allegation set forth above.

95.    Plaintiff believes the totality of the evidence proves the money included as Defendant Currency constitutes moneys or other things of value furnished or intended to be furnished in exchange for a controlled substance and/or used or intended to be used to facilitate one or more violations of 21 U.S.C. §§ 841(a)(1) and 846.

96.    As a result of the foregoing, the Defendant Currency is liable to condemnation and forfeiture to Plaintiff pursuant to 21 U.S.C. § 881(a)(6).

## VII.    COUNT TWO
## FORFEITURE UNDER 21 U.S.C. § 881(a)(7)

97.    Plaintiff repeats and realleges each and every allegation set forth above.

98.    Plaintiff believes the totality of the evidence proves the MCMULLEN Real Property was used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of one or more violations of 21 U.S.C. §§ 841(a)(1), 846, and/or 856, which are punishable by more than one year's imprisonment.

99.    As a result of the foregoing, the Defendant Real Property is liable to condemnation and forfeiture to Plaintiff pursuant to 21 U.S.C. § 881(a)(7).

## VIII.    COUNT THREE
## FORFEITURE UNDER 21 U.S.C. § 881(a)(11)

100.    Plaintiff repeats and realleges each and every allegation set forth above.

101.    Plaintiff believes the firearms included as Defendant Firearms were used or intended to be used, at least in part, to facilitate the transportation, sale,

receipt, possession, or concealment of controlled substances and proceeds thereof resulting from one or more violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846.

102.    As a result of the foregoing, the Defendant Firearms are liable to condemnation and forfeiture to Plaintiff pursuant to 21 U.S.C. § 881(a)(11).

## IX.    CONCLUSION

WHEREFORE, Plaintiff requests the foregoing property be civilly forfeited and such other relief to which it is entitled under federal law.

Respectfully Submitted,

David C. Waterman
United States Attorney

By: */s/ Craig Peyton Gaumer*
Craig Peyton Gaumer
Assistant United States Attorney
U.S. Attorney's Office
210 Walnut Street, Suite 455
Des Moines, IA 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: craig.gaumer@usdoj.gov

## VERIFICATION

I, Austen Farver, hereby verify and declare under penalty of perjury that I am a Special Agent with the Iowa Division of Narcotics Enforcement, that I have read the foregoing Verified Complaint and that I know the contents thereof and the matters contained therein are true to my own knowledge, except for those matters not within my own personal knowledge, and as to those matters, I believe them to be true.

The sources of my knowledge and information and the grounds for my belief are the official files and records of the Iowa Division of Narcotics Enforcement and information provided to me by other law enforcement officers, as well as my investigation of this case, together with others.

Dated: 03/11/2026_____.

Farver Austen
Digitally signed by Farver Austen
Date: 2026.03.11 09:36:03
-05'00'

Austen Farver, Special Agent
Iowa Division of Narcotics Enforcement